# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

## MAKOWSKI v GOVERNOR

Docket No. 146867. Argued December 11, 2013 (Calendar No. 4). Decided June 3, 2014.

Matthew Makowski filed an action in the Court of Claims against the Governor and the Secretary of State, seeking a declaratory judgment and injunctive relief to reverse then Governor Jennifer Granholm's decision to revoke her commutation of plaintiff's nonparolable life sentence that had been imposed for his first-degree murder and armed robbery convictions. The Governor had signed the commutation on December 22, 2010, after which it was signed by the Secretary of State and affixed with the Great Seal; however, four days later, the Governor decided to revoke the commutation order, and all copies of the commutation certificate were destroyed. Plaintiff alleged that the commutation was final when it was signed, sealed, and delivered to the Department of Corrections, and argued that the Governor lacked the authority to revoke a completed commutation. The court, Richard D. Ball, J., granted defendants' motion for summary disposition, concluding that it lacked jurisdiction to review the governor's exercise of discretion over commutation decisions. Plaintiff appealed. The Court of Appeals, O'CONNELL, P.J., and CAVANAGH and DONOFRIO, JJ., affirmed, holding that the Governor's exercise of the commutation power presented a nonjusticiable political question. 299 Mich App 166 (2012). The Supreme Court granted plaintiff's application for leave to appeal. 494 Mich 876 (2013).

In an opinion by Justice CAVANAGH, joined by Chief Justice YOUNG and Justices MARKMAN, KELLY, AND VIVIANO, the Supreme Court *held*:

The interpretation and exercise of the Governor's powers under Const 1963, art 5, § 14 were justiciable questions properly before this Court. The Constitution did not give the Governor the power to revoke a validly granted commutation. A commutation is complete when it is signed by the Governor and the Secretary of State and affixed with the Great Seal. Because the Governor signed plaintiff's commutation and delivered it to the Secretary of State, where it was signed and affixed with the Great Seal, plaintiff was granted an irrevocable commutation of his sentence.

1. The case did not present a nonjusticiable political question. First, while the Constitution grants the Governor absolute discretion regarding whether to grant or deny a commutation, the Constitution also restricts the procedure of a commutation to that which is provided by law. Accordingly, the procedure of a commutation, including its finality, is not wholly committed by the text of the Constitution to the Governor. Second, resolution of the question presented did not demand that the Court move beyond areas of judicial expertise

because the case rested on legal questions of constitutional interpretation and the vesting of rights, which are judicial in nature and did not involve determining whether the Governor had exercised sound judgment. Third, there were no prudential considerations that prevented the Court from resolving the issue, given that determining the extent of the Governor's powers was a matter of constitutional law rather than political discretion.

2. Reviewing the Governor's exercise of the commutation power to determine its constitutionality did not violate separation-of-powers principles because determining the extent of the Governor's powers was not an exercise of the whole power of commutation.

3. Plaintiff's sentence was commuted after the commutation had been signed by the Governor, signed by the Secretary of State, and affixed with the Great Seal because the Governor clearly intended to commute the sentence and the last act required of the executive had been completed.

4. The Constitution did not grant the Governor the power to revoke a commutation. The fact that Const 1963, art 5, § 14 specifically provides that the Governor may grant a commutation implies that the Governor's power is limited only to that ability, and to interpret this power as implicitly providing the power to revoke would not give the Constitution the sense most obvious to the common understanding because to revoke is the opposite of to grant. Further, the existence of the power to grant a conditional commutation implies that a commutation that is not expressly subject to conditions may not be revoked. Moreover, the Governor's attempt to revoke plaintiff's commutation impermissibly impinged on the powers of the parole board because once plaintiff's sentence was commuted, he was under the parole board's jurisdiction. Also, should the Governor have the power to revoke a commutation, it is not clear at what point that power would cease. The purpose sought to be accomplished by the pardon power did not counsel a different result.

Court of Appeals judgment reversed; Department of Corrections ordered to reinstate plaintiff's sentence as a parolable life sentence; plaintiff remanded to the jurisdiction of the parole board.

Justice ZAHRA, concurring, wrote separately because he would have adhered to the analysis in *Marbury v Madison*, 5 US (1 Cranch) 137 (1803), which stated that a power has been exercised when the last act required from the person possessing the power has been performed, to conclude that the commutation became final when the Governor signed it rather than when the ministerial duty of affixing the Great Seal was completed by the Secretary of State.

Justice MCCORMACK took no part in the decision because of her prior involvement in the case.

©2014 State of Michigan

# Opinion

Chief Justice:          Justices:
Robert P. Young, Jr.    Michael F. Cavanagh
                        Stephen J. Markman
                        Mary Beth Kelly
                        Brian K. Zahra
                        Bridget M. McCormack
                        David F. Viviano

FILED June 3, 2014

S T A T E   O F   M I C H I G A N

SUPREME COURT

MATTHEW MAKOWSKI,

      Plaintiff-Appellant,

v                                         No. 146867

GOVERNOR and SECRETARY OF
STATE,

      Defendants-Appellees.

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

      This case requires us to consider the extent to which the Governor's exercise of the pardon powers conferred by Const 1963, art 5, § 14 is justiciable; whether our review of the pardon powers offends the separation-of-powers doctrine; whether the commutation of plaintiff's sentence was complete; and whether Const 1963, art 5, § 14 grants the Governor the power to revoke a commutation. We hold that the extent of the Governor's pardon powers is a justiciable question and our review does not violate the

separation-of-powers doctrine. We also hold that the Michigan Constitution does not grant the Governor the power to revoke a valid commutation, and that plaintiff's commutation was valid and irrevocable when it was signed by the Governor and the Secretary of State and affixed with the Great Seal. Accordingly, we reverse the judgment of the Court of Appeals, order the Department of Corrections to reinstate plaintiff's sentence to a parolable life sentence, and remand plaintiff to the jurisdiction of the parole board.

## I. FACTS AND PROCEDURAL HISTORY

In 1988, plaintiff was a manager at a Dearborn health club. Plaintiff gave cash to one of his employees to act as a courier and sent the courier to a bank to obtain a money order. Plaintiff then conspired with a second employee and that employee's roommate to have the roommate rob the courier en route to the bank. During the attempted robbery, the courier fought back and the roommate stabbed the courier, resulting in the courier's death. Plaintiff was charged with and convicted of first-degree felony murder and armed robbery and sentenced to life in prison without the possibility of parole.

Plaintiff was a model prisoner, receiving only two minor misconduct tickets while in prison. In January 2010, plaintiff filed an application for commutation. Plaintiff's application was considered by the parole board, which recommended that the case proceed to a public hearing. The parole board sent notice of the hearing to the Wayne County Prosecutor and to the successor Wayne County Circuit Judge. Notice was not sent to the victim's family because the family members failed to register as victims as required for notice under the Crime Victim's Rights Act. See MCL 780.769. A hearing

2

was scheduled for October 21, 2010, and the Michigan Department of Corrections posted public notice of the hearing on its website in early October. At the hearing, neither the prosecutor nor the victim's family appeared or opposed commutation. Following the hearing, the parole board sent the commutation application to then Governor Jennifer Granholm with a favorable recommendation.

On December 22, 2010, the Governor signed the commutation. The Governor's office sent the signed commutation to the Secretary of State, who affixed the Great Seal and autopenned the Secretary of State's signature to the commutation. At 1:52 p.m., the Governor's deputy legal counsel sent an e-mail to several state officials announcing that "[t]he Governor has approved the commutation request of [plaintiff]." Early December 23, 2010, the Governor's legal counsel received a call from a lawyer representing the victim's family, who expressed the family's opposition to the commutation and the family's unhappiness with the lack of notice.

On December 27, 2010, the Governor's deputy legal counsel delivered a letter from the Governor to the parole board chair officially directing the chair to halt all commutation proceedings and indicating that the Governor intended to revoke the commutation. The Governor's deputy legal counsel obtained and destroyed all copies of the certificate of commutation. On December 31, 2010, Governor Granholm left office and on January 1, 2011, newly elected Governor Rick Snyder assumed office. On March 25, 2011, the parole board reconsidered plaintiff's commutation, voted against recommending plaintiff for commutation, and notified the newly elected Governor of its negative recommendation. On April 15, 2011, the Governor denied plaintiff's commutation.

Plaintiff brought suit on May 19, 2011, alleging that the commutation of his sentence was final on December 22, 2010, when it was signed, sealed, and delivered to the Department of Corrections. Plaintiff also alleged that the Governor lacked authority to revoke a completed commutation and that the revocation increased plaintiff's sentence in violation of the Double Jeopardy Clauses and plaintiff's due process rights. The parties filed cross-motions for summary disposition, and on November 15, 2011, the trial court granted the state's motion for summary disposition, ruling that the court lacked jurisdiction to consider the issue. Plaintiff appealed, and the Court of Appeals affirmed. *Makowski v Governor*, 299 Mich App 166, 168; 829 NW2d 291 (2012). We granted leave to appeal.

## II. STANDARD OF REVIEW

Questions of constitutional and statutory interpretation are reviewed de novo. *Midland Cogeneration Venture Ltd Partnership v Naftaly*, 489 Mich 83, 89; 803 NW2d 674 (2011).

## III. ANALYSIS

### A. POLITICAL QUESTION DOCTRINE

We must first consider whether this case presents a nonjusticiable political question. The concept of a nonjusticiable political question was introduced in the seminal United States Supreme Court case *Marbury v Madison*, 5 US (1 Cranch) 137; 2 L Ed 60 (1803). When considering whether the United States Supreme Court had the power to review the questions posed in *Marbury*, the Court explained that "[b]y the constitution of the United States, the president is invested with certain important political

4

powers, in the exercise of which he is to use his own discretion" and "[i]n such cases, . . . whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion." *Id*. at 165-166. Accordingly, courts may not inquire into how the executive or his officers perform their duties in which they have discretion. *Id*. at 170. The Court held that questions that by their nature are political or that are submitted only to the executive by the Constitution cannot be reviewed by courts. *Id*. However, "it is, emphatically, the province and duty of the judicial department, to say what the law is." *Id*. at 177. The Court held that whether the executive act of granting a commission vested a legal right in the appointee was a legal question, properly determinable by the courts. *Id*. at 171.[1]

In *House Speaker v Governor*, 443 Mich 560; 506 NW2d 190 (1993), we addressed the political-question doctrine and considered whether under Const 1963, art 5, § 2 the Governor had the power to transfer all powers and duties from a legislatively created department of the executive branch responsible for environmental protection to a gubernatorially created department that had the same purpose. *House Speaker*, 443 Mich at 564. One of the arguments in *House Speaker*, as in this case, was that the Governor's exercise of power was not properly reviewable by this Court. *Id*. We applied a three-part test to determine whether the question presented was a nonjusticiable political question:

> [1] [d]oes the issue involve resolution of questions committed by the text of the Constitution to a coördinate branch of Government? [2] Would resolution of the question demand that a court move beyond areas of

---

[1] Ultimately, *Marbury* was dismissed for lack of jurisdiction because the case was brought in the United States Supreme Court, which did not have original jurisdiction to hear a writ-of-mandamus case. *Marbury*, 5 US at 175-176.

judicial expertise? [3] Do prudential considerations for maintaining respect between the three branches counsel against judicial intervention? [*Id*. at 574, citing *Goldwater v Carter*, 444 US 996, 998; 100 S Ct 553; 62 L Ed 2d 428 (1979) (brackets and quotation marks omitted).]

First, we consider whether the issue involves the resolution of questions that the text of the Constitution commits to a coordinate branch of government. *Id*. In addressing this question, the United States Supreme Court has stated that "the courts must, in the first instance, interpret the text in question and determine whether and to what extent the issue is textually committed." *Nixon v United States*, 506 US 224, 228; 113 S Ct 732; 122 L Ed 2d 1 (1993). Therefore, we must begin by interpreting the text of the constitutional provision in question.

"In interpreting the constitution, this Court has developed two rules of construction." *Soap & Detergent Ass'n v Natural Resources Comm*, 415 Mich 728, 745; 330 NW2d 346 (1982). First, the interpretation should be "the sense most obvious to the common understanding; the one which reasonable minds, the great mass of people themselves, would give it." *Id*. (citations and quotation marks omitted). Second, in previous cases we have considered "the circumstances surrounding the adoption of the constitutional provision and the purpose sought to be accomplished[.]" *Id*. (citations and quotation marks omitted). The Constitution provides that the Governor may grant commutations "subject to procedures and regulations prescribed *by law*." Const 1963, art 5, § 14 (emphasis added).[2] Thus, the sense most obvious to the common understanding

---

[2] Const 1963, art 5, § 14 provides:

> The governor shall have power to grant reprieves, commutations and pardons after convictions for all offenses, except cases of impeachment, upon such conditions and limitations as he may direct, subject to

6

of article 5, § 14 is that it clearly places a limit on the Governor's pardon power by allowing the Legislature to enact laws that determine the necessary procedures and regulations surrounding commutations. Therefore, while the Michigan Constitution provides the Governor the power to *grant* commutations, the Governor is not given sole control of the pardon power.

Next, we consider "the circumstances surrounding the adoption of the constitutional provision and the purpose sought to be accomplished[.]" *House Speaker*, 443 Mich at 580. We conclude that the adoption of article 5, § 14 also indicates that the Governor's power to grant commutations is limited. The debates in the Constitutional Convention record, while not determinative, clearly support our interpretation of article 5, § 14.[3] See *House Speaker*, 443 Mich at 580-581. The debate surrounding the pardon power at the 1961 Michigan Constitutional Convention considered two main questions: whether the Governor should be granted the ability to delegate the power, and whether the Legislature should be granted the power to limit the pardon process. See 1 Official Record, Constitutional Convention 1961, 579-585. The Executive Branch Committee originally proposed that the Governor's overall duties were too strenuous to require the Governor to personally handle each individual pardon and commutation. *Id*. at 579. Thus, the Committee favored a constitutional provision that allowed the Governor to

procedures and regulations prescribed by law. He shall inform the legislature annually of each reprieve, commutation and pardon granted, stating reasons therefor.

[3]As this Court has previously noted, the constitutional convention debates, while not controlling, "are sometimes illuminating, affording a sense of direction . . . ." *House Speaker*, 443 Mich at 581.

7

delegate the pardon duties. *Id.* However, the delegates expressed discomfort with allowing the Governor to delegate the pardon power, *id*. at 579-580, and the Hutchinson Amendment removed the Governor's ability to do so by inserting the word "exercise" instead of the word "delegate" when referring to the Governor's pardon powers, *id*. at 583.[4] The debate makes it clear that the convention delegates were uncomfortable with anyone other than the chief executive exercising the pardon power. *Id*. at 579-580.

The later debate surrounding the Hutchinson Amendment considered whether the Legislature should have the power to regulate the Governor's pardon power. *Id*. at 585-587. There was support for the concept that the Legislature could control the procedures for a pardon, but there was concern that the Legislature could make the process so difficult that the Governor's power to grant a pardon could be nearly eliminated. *Id*. at 586-587. Nevertheless, the limitations on the pardon power were ultimately incorporated, and the provision was referred to the Committee on Style and Drafting reading that the pardon power was "subject to regulations provided by law relative to the manner of applying for pardon." *Id*. at 588. After returning to committee, the text of the pardon power provision was edited to insert the phrase "and procedures" after "regulations" and to strike "relative to the manner of applying for pardon." 2 Official Record, Constitutional Convention 1961, p 2740. The comments concerning the introduction of the revised text clarify that the intent of the alteration was to reflect the

---

[4] The Hutchinson Amendment was not ultimately adopted, and, instead, the provision was returned to committee in order to better craft the language. 1 Official Record, Constitutional Convention 1961, pp 586-587. However, a later amendment, the Faxon Amendment, was adopted that placed the pardon power solely with the Governor. *Id*. at 587-588.

convention's view that the Legislature could control the procedure, as consistent with the previous debate.  *Id*. at 2740-2741.  Indeed, the vesting of the Legislature with the power to control the procedures of commutations and pardons is not surprising because we have long recognized this as a legislative power.  See *Rich v Chamberlain*, 104 Mich 436, 441; 62 NW 584 (1895) (explaining that "the Constitution, in express terms, lodges the pardoning power with the governor, and with it the co-ordinate branches of government have nothing to do, except as the legislature may by law provide how applications may be made . . . .").  Thus, our interpretation of Const 1963, art 5, § 14 leads us to the conclusion that the Governor's power to commute a sentence is limited by those procedures and regulations that the Legislature enacts.

Accordingly, the distribution of power between the Legislature and the Governor regarding commutations creates a legal question that this Court must answer.  In *Nixon*, the United States Supreme Court held that the process by which the Senate impeaches a judge is nonjusticiable.  However, a key consideration in *Nixon*'s holding was that the United States Constitution gives the Senate the "*sole*" power to try all impeachments.  *Nixon* held that the use of the word "sole" indicated that the authority resided with the Senate and nowhere else.  *Nixon*, 506 US at 229.  Alternatively, *House Speaker* relied on the fact that the Constitution did not place the responsibility for effectuating legislation protecting natural resources within the "*sole* control" of the Legislature.  *House Speaker*, 443 Mich at 580 (quotation marks omitted).  Whether the Governor had the constitutional power to create his own department and transfer powers to that department from the existing legislatively created department did not present a nonjusticiable question and,

9

instead, only required that the Court apply the rules of constitutional interpretation. *Id*. at 575-576.

In this case, the fact that the Constitution provides the Legislature the power to regulate the process by which commutations are granted means that the Governor does not have "sole control" over the pardon power. The Court of Appeals held that the Governor's absolute discretion was not limited by the statutory provisions that set forth the procedural requirements of commutations. *Makowski*, 299 Mich App at 175. However, the Court of Appeals' analysis misses the mark because the Governor's *power* to grant commutations is limited by the statutory provisions. Therefore, as in *House Speaker*, we only need to apply the rules of constitutional interpretation and interpret the relevant statutes to determine at what point the commutation was complete. *House Speaker*, 443 Mich at 574. We do not examine the exercise of the Governor's discretion, as the Court of Appeals held; instead, we interpret the extent of the Governor's power. The Constitution indeed grants the Governor absolute discretion regarding whether to grant or deny a commutation; however, the Constitution restricts the *procedure* of a commutation to that which is provided by law. Thus, the Constitution does not grant "absolute power" to the Governor, *Makowski*, 299 Mich App at 175, and we therefore conclude that the procedure of a commutation, including its finality, is not wholly committed by the text of the Constitution to the Governor.

Considering the second *House Speaker* question, resolution of the question presented in this case does not demand that the Court move beyond areas of judicial expertise, *House Speaker*, 443 Mich at 574, because "there is no 'lack of judicially discoverable and manageable standards for resolving' this case; nor is a decision

10

impossible 'without an initial policy determination of a kind clearly for nonjudicial discretion.' " *Goldwater*, 444 US at 999 (Powell, J., concurring), quoting *Baker v Carr*, 369 US 186, 217; 82 S Ct 691; 7 L Ed 2d 663 (1962). The Court of Appeals held that resolution of this case "would constitute mere guess and speculation" and that there were no judicially discoverable and manageable standards that would have allowed a court to determine "how and precisely when a commutation application is considered 'granted . . . .' " *Makowski*, 299 Mich App at 176. However, as previously stated, this case ultimately rests upon the interpretation of our Constitution—a legal question—and it is this Court's duty to say "what the law is." *Marbury*, 5 US at 177. " '[D]eciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court . . . .' " *House Speaker*, 443 Mich at 575, quoting *Baker*, 369 US at 211. And to the extent that we must consider whether the Governor's actions granted plaintiff a commutation, "[t]he question whether a right has vested or not, is, in its nature, judicial, and must be tried by the judicial authority." *Marbury*, 5 US at 167.

Through MCL 791.234(1), our Legislature has provided that a prisoner serving a sentence with a minimum term of years "is subject to the jurisdiction of the parole board when the prisoner has served a period of time equal to the minimum sentence imposed by the court for the crime of which he or she was convicted . . . ." The assumed language of plaintiff's commutation provided that his sentence was commuted "to [time served in years, months, and days as calculated by the Department of Corrections] minimum to life maximum, thereby making him eligible for parole on [a date some months earlier than

11

the date of the commutation].["][5]  Therefore, a validly executed commutation brought plaintiff within the jurisdiction of the parole board pursuant to MCL 791.234(1), making him eligible for parole, and, thus, granted him the right to parole consideration.  A person eligible for parole is not entitled to parole as a matter of right.  See MCL 791.234(11) (stating that "a prisoner's release on parole is discretionary with the parole board"); *Adams v Russell*, 169 Mich 606, 608; 135 NW 658 (1912) (holding similarly when considering a previous version of the parole statute); *Greenholtz v Inmates of the Nebraska Penal & Corr Complex*, 442 US 1, 7; 99 S Ct 2100; 60 L Ed 2d 668 (1979) (holding that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence").  However, under MCL 791.234(1), a person who is eligible for parole is nonetheless differently situated from a person serving a nonparolable life sentence.  This change in status allegedly conferred by the commutation granted plaintiff the right to parole consideration.  Cf. *Ex Parte Garland*, 71 US (4 Wall) 333, 380-381; 18 L Ed 366 (1866) ("[I]f granted after conviction, [a pardon] removes the penalties and disabilities and restores him to all his civil rights; it . . . gives him a new credit and capacity.").

Therefore, in this case, as in *Marbury*, a legal document was signed by an executive granting a person a right.  The executive then attempted to revoke the right granted by the document.  Thus, as in *Marbury*, at issue is the Court's ability to

---

[5] Plaintiff's commutation certificate was destroyed pursuant to the Governor's command after the decision to revoke the commutation.  However, all commutations issued by the Governor contained the same standard language and components, and the state does not contest the assumed language of plaintiff's commutation.

determine whether the document granting plaintiff's commutation was effective despite the lack of a codified procedure, and whether the commutation, if validly granted, may be revoked. The similarities between this case and *Marbury* are notable, and the fact that the United States Supreme Court reached the merits in *Marbury* is persuasive. In *Marbury*, President Adams commissioned multiple justices of the peace for Washington, D.C. *Marbury*, 5 US at 155. However, the commissions were not delivered to the newly commissioned justices of the peace before the change of presidential administrations. After the new administration took office, James Madison, the new Secretary of State, refused to deliver the commissions. The commissioned justices of the peace brought suit in the United States Supreme Court seeking a writ of mandamus requiring Madison to deliver the commissions. *Id*. at 153-154.

Similar to the situation in *Marbury*, the Michigan Constitution grants the Governor a power without providing explicit procedural requirements for its exercise. The lack of procedural requirements for commutations does not foreclose this Court's ability to consider the validity and finality of commutations. Indeed, this Court has in the past considered whether a gubernatorial pardon was valid, holding that a pardon bearing the Great Seal and the signatures of the Governor and Secretary of State was sufficient despite defects on the face of the document. *Spafford v Benzie Circuit Judge*, 136 Mich 25, 27; 98 NW 741 (1904). In *Spafford*, the requirements for a pardon were not legislatively prescribed; nevertheless, this Court reached the merits.[6] *Id*.

---

[6] The constitutional provision considered in *Spafford* provided that the Governor "may grant . . . commutations . . . for all offenses, except treason and cases of impeachment, upon such conditions and with such restrictions and limitations as he may think proper,

Turning to the controlling statutes in this case, under MCL 791.243 and MCL 791.244, applications for commutation must first be presented to the parole board for a recommendation. Further, under MCL 2.44(d), "[a]n impression of the great seal shall be placed on" commutations. The Legislature has not provided express guidance as to what is required for a completed commutation beyond the Great Seal requirement found within MCL 2.44. However, our review is not foreclosed merely because the Legislature has been largely silent on the proper procedures surrounding commutations. Contrary to the Court of Appeals' holding, we are not "legislat[ing] how and when a commutation decision becomes final and irrevocable." *Makowski*, 299 Mich App at 176. "Some point of time must be taken, when the power of the executive . . . must cease," *Marbury*, 5 US at 157, and, therefore, we simply must determine when that time is. Thus, whether the Governor's actions granted plaintiff a right to commutation of his sentence and, if so, whether the Governor may revoke a commutation under the Michigan Constitution are questions that are not only well within this Court's expertise, they are questions that this Court has the duty to answer. This Court need not determine whether the Governor exercised sound judgment in granting and revoking plaintiff's commutation; we merely must determine whether the Governor completed all the steps legally required to grant

subject to regulations provided by law relative to the manner applying for pardons." Const 1908, art 6, § 9. Arguably, the previous commutation provision of the Constitution provided the Governor greater discretion regarding the powers of commutation than the current Constitution, because the Legislature's power in governing the commutation process was limited to the application. Therefore, although *Spafford* did not expressly consider justiciability, because the Court reached the merits in that case, it is logical that the Court may also reach the merits in this case. See *Spafford*, 136 Mich at 27.

14

plaintiff a commuted sentence and whether the Constitution affords the Governor the power to revoke a valid commutation. Therefore, we need not move beyond the areas of judicial expertise in deciding this case.

Addressing the third *House Speaker* question, there are no prudential considerations that prevent this Court from resolving the issue. *House Speaker*, 443 Mich at 574. The Court of Appeals erroneously examined whether "Michigan's Constitution empowers the Governor, solely, to exercise *judgment* in commutation matters." *Makowski*, 299 Mich App at 178-179 (emphasis added). But, once again, we do not review the merits underlying the Governor's discretionary exercise of judgment but rather the *extent* of the Governor's powers. "The issue of decisionmaking *authority* must be resolved as a matter of constitutional law, not political discretion; accordingly, it falls within the competence of the courts." *Goldwater*, 444 US at 1007 (Brennan, J., dissenting) (emphasis added). Nor are we "coerc[ing] an outcome that is contrary to the . . . Governor's clear intention . . . ." *Makowski*, 299 Mich App at 179. "Interpreting the constitution does not imply a lack of respect for another branch of government, even when that interpretation differs from that of the other branch." *House Speaker*, 443 Mich at 575. And while this case certainly presents a politically charged issue, the mere fact that a question involves political issues does not make it a "political question." *Id*. at 574. " 'The courts cannot reject as "no law suit" a bona fide controversy as to whether some action denominated "political" exceeds constitutional authority.' " *Id*., quoting *Baker*, 369 US at 217. Indeed, "the mere fact that [a] suit seeks protection of a political right does not mean it presents a political question. Such an objection 'is little more than a play upon words.' " *Baker*, 369 US at 209, quoting *Nixon v Herndon*, 273 US 536,

15

540; 47 S Ct 446; 71 L Ed 759 (1927).  In sum, there is nothing that precludes us from reaching the merits in this case.

## B.  SEPARATION OF POWERS

Our review of the Governor's exercise of the powers of commutation is not an impermissible violation of the separation of powers.  While the Constitution provides for three separate branches of government, Const 1963, art 3, § 2, the boundaries between these branches need not be "airtight," *Kent Co Prosecutor v Kent Co Sheriff (On Rehearing)*, 428 Mich 314, 322; 409 NW2d 202 (1987), quoting *Nixon v Administrator of Gen Servs*, 433 US 425, 443; 97 S Ct 2777; 53 L Ed 2d 867 (1977).  In fact, "[i]n designing the structure of our Government and dividing and allocating the sovereign power among three co-equal branches, the Framers of the Constitution sought to provide a comprehensive system, but the separate powers were not intended to operate with absolute independence." *Kent Co Prosecutor*, 428 Mich at 322, quoting *United States v Nixon*, 418 US 683, 707; 94 S Ct 3090; 41 L Ed 2d 1039 (1974).  "The true meaning [of the separation-of-powers doctrine] is that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments; and that such exercise of the whole would subvert the principles of a free Constitution." *Local 321, State, Co & Muni Workers of America v City of Dearborn*, 311 Mich 674, 677; 19 NW2d 140 (1945) (citation and quotation marks omitted).

While the Constitution reserves the pardon power for the Governor, this Court may review the Governor's exercise of that power to ensure that it is constitutional.  Cf.

*Buback v Governor*, 380 Mich 209, 217-219; 156 NW2d 549 (1968) (opinion by ADAMS, J.) (stating that the Court may review the Governor's removal power to ensure that it is exercised within the confines of the Due Process Clause).  It is true that the courts may not commute a sentence.  *People v Freleigh*, 334 Mich 306, 310; 54 NW2d 599 (1952).  However, we are not commuting plaintiff's sentence, as the state argues; rather, we are determining the extent of the Governor's power under Const 1963, art 5, § 14.  The Governor ordered the commutation of plaintiff's sentence and the revocation of the commutation.  We do not judge the Governor's discretion, nor do we usurp the Governor's power and direct plaintiff's commutation.  We merely determine what rights, if any, the Governor granted plaintiff upon the delivery of the certificate of plaintiff's commutation to the Department of Corrections, and whether it was within the Governor's power to revoke any rights granted.  As previously explained, our review of whether the Governor granted and may revoke a commutation in this case is not an exercise of the "whole power" of commutation.  Instead, it is a determination of the extent of the Governor's powers under the Constitution.  Therefore, our review of this case does not offend separation-of-powers principles.

## C.  FINALITY OF THE COMMUTATION

The Governor's power to grant commutations under Const 1963, art 5, § 14 is limited "to those procedures and regulations prescribed by law."  Const 1963, art 5, § 14. As stated earlier, the similarities between the facts and the questions presented in this case and *Marbury* are striking.  Thus, the United States Supreme Court's analysis in *Marbury* is helpful in this case where we otherwise have little guidance.  In *Marbury*, the

17

commissions were confirmed by the Senate, signed by the President, and affixed with the seal of the United States by the Secretary of State. *Marbury*, 5 US at 155. However, the commissions were not delivered to the newly commissioned justices of the peace, and James Madison sought to block their appointment. *Id*. Specifically, *Marbury*'s analysis regarding whether the justices of the peace were entitled to the commissions necessarily considered whether the appointments were effective, *id*., and is particularly relevant to our analysis here.

When considering whether the justices of the peace were entitled to the commissions, *Marbury* determined that once the President signed the commission, the commission was complete, as that was the last act required of the person making it. Importantly, *Marbury* stated that "[s]ome point of time must be taken, when the power of the executive over an officer, not removable at his will, must cease. That point of time must be, when the constitutional power of appointment has been exercised." *Id*. at 157. *Marbury* held that the power has been exercised "when the last act, required from the person possessing the power, has been performed," which was the signing of the commission. *Id*.

*Spafford* is also instructive. In *Spafford*, the defendant was convicted of manslaughter, but was pardoned before he was sentenced. The defendant filed a motion for his discharge, but the county judge denied the motion, claiming that the pardon was not effective because of multiple defects on the face of the document. *Spafford*, 136 Mich at 26-27. This Court determined that none of the defects rendered the pardon invalid because the pardon's "substance left no doubt of the intention of the Governor to extend executive clemency." *Id*. at 27. Further, the Court stated that it had "no doubt of

18

the validity of the instrument when signed by the Governor . . . and attested by the signature of the secretary of state and the great seal of the State, if otherwise regular in form and substance." *Id*.

The text of the commutation makes it clear that the commutation was final: "Now Therefore, I, Jennifer M. Granholm, Governor of the State of Michigan, do *hereby* commute the sentence of [plaintiff] . . . ." (Emphasis added). See *Soap & Detergent Ass'n*, 415 Mich at 757 (discussing the rules for interpretation of executive acts and explaining that "[t]he executive intends the meaning that is clearly expressed"). "Hereby" is defined as "[b]y this document; by these very words[.]" *Black's Law Dictionary* (8th ed). Thus, we conclude that the commutation's substance "left no doubt of the intention of the governor to extend executive clemency." *Spafford*, 136 Mich at 27. Indeed, it is clear that the Governor herself considered the commutation completed. The letter signed by the Governor ordering the parole board to refrain from effectuating the commutation stated, "[I]t is my intention . . . to *revoke* the commutation of [plaintiff's] sentence before fully effectuated." (Emphasis added.) The Governor's use of the word "revoke" indicates that the Governor herself believed that the commutation had been granted. Moreover, e-mails among executive officers explicitly stated that the commutation was "[g]ranted and certificates [were] delivered" in response to an inquiry whether the Governor had already granted the commutation, suggesting that the executive branch believed that the commutation had been granted.

Additionally, as *Marbury* explained, at some point the executive power to commute a sentence must have been exercised. *Marbury* held that executive power had been exercised "when the last act, required from the person possessing the power, has

19

been performed," which, in that case, was the signature of the commission. *Marbury*, 5 US at 157. While the discretion to grant a commutation lies solely with the Governor, our Legislature has provided that a commutation must be affixed with the Great Seal. Indeed, *Marbury*, in considering a similar congressional statute that required that the commissions be sealed, stated that "when the seal is affixed, the appointment is made, and the commission is valid. No other solemnity is required by law; *no other act is to be performed on the part of government.*" *Marbury*, 5 US at 158-159 (emphasis added). After being signed, the commutation was delivered to the Secretary of State for affixation of the Great Seal, as required by MCL 2.44. Therefore, when the commutation was signed by the Governor, signed by the Secretary of State, and affixed with the Great Seal, the last act required of the executive branch had been performed and the Governor's power of commutation had been exercised. Because it was both the clear intent of the Governor to commute plaintiff's sentence and the last act required of the executive for a commutation had been completed, we hold that once the commutation was affixed with the Great Seal by the Secretary of State, plaintiff's sentence had been commuted.

## D. THE GOVERNOR'S POWER TO REVOKE A COMMUTATION

Because we hold that the Governor granted plaintiff a commutation, we must next determine whether Const 1963, art 5, § 14 grants the Governor the power to revoke a commutation. As previously stated, we consider two questions when interpreting the Constitution: the interpretation must be "the sense most obvious to the common understanding" and "the circumstances surrounding the adoption of the constitutional

20

provision and the purpose sought to be accomplished[.]" *House Speaker*, 443 Mich at 577, 580 (citations and quotation marks omitted).

The language of the Constitution confers only the power to *grant* commutations. The fact that the Constitution specifically provides that the Governor may grant a commutation implies that the Governor's power is limited only to that ability. To interpret the expressly provided power to "grant" to implicitly provide the power to "revoke" would not give the Constitution "the sense most obvious to the common understanding" because the meaning of the word "revoke" is the exact opposite of the word "grant." See *Merriam-Webster's Collegiate Dictionary* (2011) (defining "grant" as "to bestow or transfer formally" and "revoke" as "to annul by recalling or taking back").

Notably, the Constitution permits the Governor to grant *conditional* pardons and commutations.[7] When a Governor has granted a conditional commutation, if the conditions are not fulfilled, the Governor may revoke the commutation. See *People v Marsh*, 125 Mich 410; 84 NW 472 (1900). Given that the power to grant a conditional commutation exists, it logically follows that a commutation that is not expressly subject to conditions and limitations may not be revoked.

Moreover, it is well established that a trial judge does not have the power to change a valid sentence because the judge's authority over the prisoners has passed once the sentence is imposed, see *People v Fox*, 312 Mich 577; 20 NW2d 732 (1945), and that increasing a validly imposed sentence is impermissible, *Ex Parte Lange*, 85 US (18 Wall)

---

[7] Const 1963, art 5, § 14 states that the Governor may grant pardons and commutations "upon such *conditions and limitations* as he may direct." Emphasis added.

21

163, 173; 21 L Ed 872 (1873). Similarly, the Governor's attempt to revoke a valid commutation was impermissible because her authority over the prisoner's commutation had passed. Once plaintiff's sentence was commuted, he was transferred to the jurisdiction of the parole board and his sentence was no longer one of life without the possibility of parole. See MCL 791.234(7). Therefore, the Governor's attempt to revoke plaintiff's commutation impermissibly impinged upon the parole board's powers by wresting plaintiff away from its jurisdiction.

Further, should the power to revoke a commutation exist, it is not clear at what point that power would cease. Because the Governor's pardon powers under article 5, §14 include the power to grant reprieves, commutations, and pardons, our interpretation of the Governor's power to grant commutations is similarly applicable to the Governor's power to grant pardons and reprieves. Thus, it is important to consider that if article 5, § 14 grants the Governor the power to revoke commutations, it would also grant the Governor the power to revoke pardons and reprieves, raising serious concerns regarding the Governor's ability to direct the reincarceration of a free person. Under the state's argument, a Governor would be able to revoke a commutation granted by that Governor so long as that Governor remains in office, thereby returning a prisoner to a nonparolable life sentence potentially years after a commutation. We do not agree that the drafters intended to give the Governor such broad powers:

> When a person has been set at liberty under the pardon or the commutation of his sentence by the executive, he becomes once more a full citizen, clothed with all the rights, privileges, and prerogatives that belong to any other freeman. He cannot be sent out half free and half slave. He is not to be let out with a rope around his body, as it were, with one end in the hands of the warden, to be hauled back at the caprice of that officer. He

22

must go out a free man, and remain a free man until he breaks the condition of his pardon. He must enjoy the blessings and benefits that belong to an American citizen until he has violated the law of his release. His character may be tarnished and his reputation soiled by his imprisonment, but his rights as a citizen are unimpaired. [*People v Moore*, 62 Mich 496, 500; 29 NW 80 (1886).]

On the basis of the foregoing considerations, it is the sense most obvious to the common understanding that the Constitution does not provide the Governor the power to revoke an unconditional commutation.

Moreover, the purpose sought to be accomplished by the pardon power does not counsel a different result. See *House Speaker*, 443 Mich at 580. We have explained that "[c]ommutations are acts of individualized clemency, typically motivated by the prisoner's personal characteristics and behavior in jail or prison" and are "aimed at benefiting the released prisoner." *Kent Co Prosecutor*, 428 Mich at 323, 324. Similarly, *Chamberlain* explained that a pardon " 'is an act of grace, proceeding from the power intrusted with the execution of the laws, which exempts the individual on whom it is bestowed from the punishment the law inflicts for a crime he has committed.' " *Chamberlain*, 104 Mich at 441, quoting *United States v Wilson*, 32 US (7 Pet) 150, 150; 8 L Ed 640 (1883). These purposes provide no indication that the pardon power was intended to grant the Governor such wide discretion that a commutation could be revoked at any time upon the Governor's whim. Accordingly, neither "the sense most obvious to the common understanding" nor "the purpose sought to be accomplished," *House Speaker*, 443 Mich at 577, 580, indicates that Const 1963, art 5, § 14 grants the Governor

23

the power to revoke a commutation. Therefore, we hold that the Governor may not revoke a completed commutation.[8]

## IV. CONCLUSION

We conclude that the interpretation and exercise of the Governor's powers under Const 1963, art 5, § 14 are justiciable questions properly before this Court. The Governor is given the power to grant commutations under article 5, § 14; however, the Constitution does not give the Governor the power to revoke a validly granted commutation. Additionally, a commutation is complete when it is signed by the Governor, signed by the Secretary of State, and affixed with the Great Seal. Therefore, because the Governor signed plaintiff's commutation and delivered it to the Secretary of State, where it was signed and affixed with the Great Seal, plaintiff was granted an irrevocable commutation of his sentence. Accordingly, we reverse the judgment of the Court of Appeals, order the Department of Corrections to reinstate plaintiff's sentence to a parolable life sentence, and remand plaintiff to the jurisdiction of the parole board.

> Michael F. Cavanagh
> Robert P. Young, Jr.
> Stephen J. Markman
> Mary Beth Kelly
> David F. Viviano

MCCORMACK, J., took no part in the decision because of her prior involvement in the case.

---

[8] Because we hold that the Governor does not have the power to revoke a completed commutation, we need not address plaintiff's argument that the revocation of his commutation was a violation of the double jeopardy clauses, US Const, Am V and Const 1963, art 1, § 15, and plaintiff's due process rights, US Const, Am XIV and Const 1963, art 1, § 17.

24

STATE OF MICHIGAN

SUPREME COURT

MATTHEW MAKOWSKI,

       Plaintiff-Appellant,

v                                No. 146867

GOVERNOR and SECRETARY OF
STATE,

       Defendants-Appellees.

_____

ZAHRA, J. (*concurring*).

The majority opinion concludes correctly that this case presents a justiciable issue, and I agree that our endeavoring to interpret the bounds of the commutation power does not offend the separation-of-powers doctrine. I also agree with the majority that Governor Granholm irrevocably commuted the plaintiff's sentence before trying to undo her decision. I write separately, however, because I disagree with the majority regarding the moment at which a commutation becomes final. While the majority concludes that a commutation may be revoked until it is affixed with the Great Seal of the State of Michigan, I conclude that a commutation becomes final when the governor signs it.

Every law student in the country reads the seminal United States Supreme Court case of *Marbury v Madison*.[1] As the majority opinion ably explains, *Marbury* concerned the validity of nine commissions issued to justices of the peace by President John Adams

_____

[1] *Marbury v Madison*, 5 US (1 Cranch) 137; 2 L Ed 60 (1803).

as he was leaving office that were not delivered to their intended recipients. While professors typically use *Marbury* to expound on the judiciary's role in government, this case presents the rare situation in which *Marbury* is relevant for its holding regarding the finality of an executive act. According to Chief Justice John Marshall in *Marbury*, a "power has been exercised, when the last act, required from the person possessing the power, has been performed[.]"[2] It cannot be gainsaid that the Governor alone possesses the commutation power,[3] and, as in *Marbury*, "[t]his last act is the signature . . . ."[4] Thus, Governor Granholm had exercised the commutation power as soon as she placed her signature on plaintiff's commutation.

The majority holds that a commutation becomes irrevocable once the secretary of state affixes the Great Seal. It reaches this conclusion because it attaches particular weight to the Legislature's command in MCL 2.44 that the Great Seal be applied to commutations and a number of other documents. But the majority fails to consider the *Marbury* Court's discussion of the United States Seal, which had to be applied to the commissions for the justices of the peace. Chief Justice Marshall wrote, "[t]he signature is a warrant for affixing the great seal to the commission; and *the great seal is only to be affixed to an instrument which is complete.*"[5] In other words, Chief Justice Marshall opined that the United States Seal authenticates a document that has become final upon

---

[2] *Id*. at 157.

[3] Const 1963, art 5, § 14.

[4] *Marbury*, 5 US at 157.

[5] *Id*. at 158 (emphasis added).

receiving the president's signature.  I attach the same significance to Michigan's Great Seal, but no more.

In reaching his conclusion in *Marbury*, Chief Justice Marshall attached particular significance to the mandate imposed on the secretary of state: "The commission being signed, the subsequent duty of the secretary of state is prescribed by law, and not to be guided by the will of the president."[6]  The United States Secretary of State's duty was ministerial; he had no discretion to do anything other than seal the commission and deliver it.  Likewise, MCL 2.44 orders Michigan's secretary of state to affix the Great Seal to a commutation;[7] it provides no further discretion to the secretary of state or the governor.  This bears emphasis: once a commutation has been signed, MCL 2.44 requires the secretary of state to affix the Great Seal, and the statute does not empower the governor to stop it.  Chief Justice Marshall called the act of affixing the seal "a ministerial act, which the law enjoins on a particular officer for a particular purpose."[8]  In Michigan, the law imposes this ministerial duty on the secretary of state, and he or she must complete the task once the governor exercises his or her discretion.[9]

---

[6] *Id*.

[7] MCL 2.44(d) ("An impression of the great seal *shall be placed on* the following documents but no others: . . . Commutations of sentences.") (emphasis added).

[8] *Marbury*, 5 US at 158.

[9] After concluding that an executive act is final upon the discretion-holder's exercise of that discretion, Chief Justice Marshall proceeded to discuss the possibility of the seal's being necessary to complete a document.  He said that even if the seal was a necessity, the commissions were still final under the facts before him: "If it should be supposed, that the solemnity of affixing the seal is necessary, not only to the validity of the commission, but even to the completion of an appointment, still, when the seal is affixed

3

The *Marbury* Court drew an important distinction between an executive act's finality and the document's completion. Chief Justice Marshall said, "It is, therefore, decidedly the opinion of the court, that when a commission has been signed by the president, the appointment is made; and that the commission is complete, when the seal of the United States has been affixed to it by the secretary of state."[10] Once again, our case is on all fours: the commutation became effective and irrevocable as soon as Governor Granholm's pen left the page—the commutation was made. The document evidencing the commutation requires the Great Seal for completion, but the executive's discretion has already been exercised.

The majority's reliance on MCL 2.44, rather than *Marbury*'s "last act" analysis, can be traced to differences between the state and federal constitutions. Specifically, the Michigan Constitution makes the governor's clemency power "subject to procedures and regulations prescribed by law."[11] The majority suggests that the requirement in MCL 2.44 that the Great Seal be applied to commutations constitutes a procedure or regulation prescribed by law and that a commutation is incomplete and ineffective without the seal.

---

the appointment is made, and the commission is valid. No other solemnity is required by law; no other act is to be performed on the part of government." *Marbury*, 5 US at 158-159. We are presented with the same situation. The outcome of this case does not turn on whether a commutation is final upon receiving the governor's signature or when the Great Seal is affixed because both were accomplished before Governor Granholm attempted to revoke the commutation.

[10] *Marbury*, 5 US at 162.

[11] Const 1963, art 5, § 14.

4

I conclude, however, that MCL 2.44 is not the type of procedure or regulation contemplated by that constitutional provision.

Drawing from the Constitutional Convention debates, the majority opinion explains at length how the "practice and procedure" language came to exist in article 5, § 14 of the Michigan Constitution. The "practice and procedure" language reflects the delegates' concern that the governor could not deal with an unfiltered influx of clemency applications. As a solution, the delegates proposed ways that the Legislature could regulate the application process. In fact, an earlier draft of the language stated that the pardon power was "subject to regulations provided by law *relative to the manner of applying for pardon.*"[12] Thus, the "practice and procedure" language refers to the Legislature's control of the application process, not to the Legislature's ability to create a point of finality different from the "last act" analysis that had stood for 160 years.

Significantly, the Legislature has taken up the constitutional provision's invitation by enacting several procedures that a candidate must complete before becoming eligible for any type of clemency. MCL 791.243 and MCL 791.244 require all applications for pardons, reprieves, and commutations to be filed with the parole board and prescribe a lengthy interview and hearing procedure for any applicant. The provisions then instruct the parole board to transmit a recommendation to the governor for a final decision. Thus, the Legislature has provided a practice and procedure through which all clemency applicants must pass, which is consistent with the Constitutional Convention delegates' concern that clemency applications should not reach the governor unfiltered.

---

[12] 1 Official Record, Constitutional Convention 1961, p 588.

5

Finally, I am concerned that the majority's holding leaves our jurisprudence with the very problem that the majority opinion identifies as a flaw in the defendants' argument. Namely, if a governor commutes a sentence but the seal is not affixed to the commutation before that governor leaves office, then nothing stops the incoming governor from revoking the commutation as soon as he or she takes office. The same would be true for any of the acts requiring the Great Seal under MCL 2.44, including appointments, commissions, and extraditions. On the other hand, remaining faithful to *Marbury*'s principled holding prevents a new governor from reversing or revoking a prior governor's unsealed executive actions.

In sum, I would adhere to *Marbury*'s "last act" analysis and conclude that the commutation power has been exercised "when the last act, required from the person possessing the power, has been performed[.]"[13] The last act required from the Governor—the holder of the commutation power—was signing the commutation. At that point, the power was exercised and the plaintiff's sentence was commuted to parolable life.

Brian K. Zahra

---

[13] *Marbury*, 5 US at 157.