*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

HOUSE OF REPRESENTATIVES and SENATE,

        Plaintiffs-Appellants/Cross-Appellees,

and

JOHN F. BRENNAN, MARK BUCCHI, SAMUEL
H. GUN, MARTIN LEAF, and ERIC ROSENBERG,

        Cross-Appellants,

v

GOVERNOR,

        Defendant-Appellee/Cross-
        Appellant/Cross-Appellee.

FOR PUBLICATION
August 21, 2020

No. 353655
Court of Claims
LC No. 20-000079-MZ

Before: MARKEY, P.J., and K. F. KELLY and TUKEL, JJ.

TUKEL, J. (*concurring in part and dissenting in part*).

## **INTRODUCTION**

I agree with the majority's decision that the Court of Claims properly denied the motion for intervention. I disagree, however, with the remainder of the majority's opinion. The U.S. Supreme Court "consistently has given voice to, and has reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty." *Mistretta v United States*, 488 US 361, 380; 109 S Ct 647; 102 L Ed 2d 714 (1989) (citations omitted).

Our Michigan Constitution broadly follows the same parameters, and has done so in similar terms since before statehood in 1837. Under our law, "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." Const 1963, art 3, § 2," (Separation of Powers of Government.); see also *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608, 613, 684 NW2d 800 (2004) ("By

separating the powers of government, the framers of the Michigan Constitution sought to disperse governmental power and thereby to limit its exercise."), overruled on other grounds by *Lansing Sch Ed Ass'n v Lansing Bd of Ed* 487 Mich 349, 792 NW2d 686 (2010).[1]

Under that tripartite approach**,** "the legislative power of the State of Michigan is vested in a senate and a house of representatives," Const 1963, art 4, § 1; "the executive power is vested in the governor," *id*. at art 5, § 1 ("Executive power."); and "the judicial power of the state is vested exclusively in one court of justice which shall be divided into one supreme court, one court of appeals, one trial court of general jurisdiction known as the circuit court, one probate court, and courts of limited jurisdiction that the legislature may establish by a two-thirds vote of the members elected to and serving in each house," *id*. at art 6, § 1 ("Judicial power in court of justice; divisions."), except "to the extent limited or abrogated by article 4, section 6 or article 5, section 2," an exception which applies to each of the three branches.[2]

This case involves the scope of those executive and legislative powers; the questions presented are whether the Legislature, in the 1945 Emergency Powers of Governor Act (hereinafter the "EPGA*")*;[3] and the 1976 Emergency Management Act (hereinafter, the "EMA"),[4] authorized a governor to rule on an emergency basis without any durational limit; and whether, if the Legislature did give such authority, its delegation of that power was constitutional. The case comes to us under executive orders issued by Governor Gretchen Whitmer relating to the current pandemic involving Covid 19. The executive orders, which have evolved over time, have in various iterations significantly restricted the liberties of all Michigan citizens in many ways, imposing broad economic and travel restrictions; setting forth mandatory stay-at-home orders; and promulgating many other regulations. The executive orders are backed by criminal sanctions, which provide that persons who violate them are subject to the misdemeanor penalties of the EPGA, see MCL 10.33, and the EMA, see MCL 30.305(3). Those orders, and the associated

---

[1] Our first constitution, in 1835, preceded statehood but nonetheless provided that "[t]he powers of the government shall be divided into three distinct departments; the Legislative, the Executive and the Judicial; and one department shall never exercise the powers of another, except in such cases as are expressly provided for in this constitution." Const 1835, art 3, § 1; and that "The legislative power shall be vested in a Senate and House of Representatives." *Id*. at art 4, § 1. Almost identical provisions have been enacted in our three subsequent constitutions, including the current one. See Const 1850, art 4, § 1; Const 1908, art 5, § 1; Const 1963, art 3, § 2.

[2] That exception is not at issue here. Article 3, section 6 involves the authority of the governor to reorganize principal departments, and places a limit of 20 on the number of such departments; Article 5, section 2 involves a citizen's redistricting commission.

[3] 1945 PA 302 as amended, codified at MCL 10.31 *et seq.*

[4] 1976 PA 390 as amended, codified at MCL 30.410 *et seq.*

criminal penalties, were imposed solely by executive order of the governor, bypassing the normal legislative process.[5]

The Governor asserts that her authority under the EPGA is essentially unlimited in scope and duration. The executive orders thus implicate statutory interpretation involving the interplay between the EPGA and the EMA, given that the later-enacted EMA provides that the governor's authority to issue such an executive order expires at the end of 28-days if not approved by both houses of the Legislature; the case also presents the question of whether, if the Legislature did grant such broad authority to the governor, such legislation was constitutional. And the Governor asserts that the Legislature lacks standing to bring the instant suit challenging the executive orders. All of those questions take place against a backdrop that no Governor ever has asserted such unbridled authority outside the normal and constitutionally-sanctioned legislative process.[6]

Ultimately, I believe the questions presented here yield a clear answer on statutory terms: the EPGA and the EMA, properly construed *in pari materia*, do not each stand on their own, as the Governor asserts and the majority holds; rather, at least in a case such as this involving an "epidemic," and for reasons discussed more fully in this opinion, the EMA's 28-day time limit controls. For reasons properly found by the Court of Claims, the Legislature has standing to bring

---

[5] Various iterations of the orders have relied on different authorities. Executive Order 2020-67 invoked the Governor's Constitutional authority under Const. 1963 Art. 5, § 1 and the EPGA; Executive Order 2020-68 invoked the Governor's Constitutional authority and the EMA, declaring both a state of emergency and a state of disaster under the EMA. See generally Part III of this opinion. Ultimately, the analysis in this opinion does not rest on which statute the Governor relied upon in any particular order, because the statutes are to be interpreted *in pari materia*, and thus both are at issue. See generally Part III of this opinion.

[6] It also is worth noting what is not at issue in this case, principally whether Covid 19 is an extremely dangerous public health challenge which must be addressed by government; clearly it is. The question thus is not whether actions should be taken by government, but rather how they should be taken—by unlimited executive fiat, or through constitutional methods in place since before statehood. We also do not weigh any particular policy prescription set forth by the Governor or the Legislature. Rather, the correct resolution turns on constitutional text; legislative language which expresses the Legislature's policy determinations, and legislative intent based on such language; all as filtered through well-established canons of construction which dictate how we view and interpret legal authorities. See *Robinson v Detroit*, 462 Mich 439, 474, 613 NW2d 307 (2000) (Corrigan, J., concurring) ("[A] Court exceeds the limit of its constitutional authority when it substitutes its policy choice for that of the Legislature[.]"). The case of course presents critical issues involving self-government, as "the underlying issues in these cases pertain to an 'emergency' of the most compelling and undisputed character," *House of Representatives v Governor*, ___ Mich ___, ___; 944 NW2d 706, 708 (2020) (Cavanagh, J., concurring), and "is arguably the most significant constitutional question presented to this Court in the last 50 years," *House of Representatives v Governor*, ___ Mich ___, ___; 943 NW2d 365, 371 (2020) (Zahra, J., dissenting), recon den 944 NW2d 706 (2020).

this suit, because the Governor's actions have vitiated the Legislature's express authority under the EMA to approve or disapprove executive orders extending beyond 28 days; properly construed, the EPGA has no role to play in this analysis. Thus, because the Governor's actions violate the EMA, as the Legislature has declined to extend the executive orders, as correctly found by the Court of Claims, I would affirm that portion of its order, and strike down the executive orders at issue. Given my preference, I also would not reach the Constitutional questions involved, particularly whether the Governor has improperly exercised legislative authority belonging to the Legislature, in violation of Article 3, § 2, of the 1963 Constitution. As discussed more fully in this opinion, the doctrine of constitutional avoidance directs us to decline such constitutional interpretation if a case can be decided on other grounds; here, the statutory analysis would fully dispose of the questions presented. However, the majority rejects the statutory analysis which I believe is mandated, which thus requires that I consider the constitutional question of whether the Governor improperly exercised (and continues to exercise) legislative powers, in violation of our Constitution. For reasons stated more fully in this opinion, I would find that the Governor's actions violate the separation of powers, and would strike down the executive orders on that basis as well. However, I agree with the majority that the Court of Claims did not abuse its discretion in denying intervention, and thus join Part IV(D) of the majority opinion.

## I. STANDING

The majority never finds that the House and the Senate have standing to pursue the present case, simply assuming that there was standing. While I would find that there was nothing incorrect in that portion of the Court of Claims' opinion which found standing, I do not think that we can simply assume standing. Therefore, I will briefly review why I think the Legislature properly established standing for this case.

Whether a party has standing is a question of law that is reviewed de novo. *Mich Ass'n of Home Builders v City of Troy*, 504 Mich 204, 212; 934 NW2d 713 (2019). Standing is a component of every case. See *Miller v Allstate Ins Co*, 481 Mich 601, 606-607; 751 NW2d 463 (2008) (citations omitted) ("Our constitution requires that a plaintiff possess standing before a court can exercise jurisdiction over that plaintiff's claim. This constitutional standing doctrine is longstanding and stems from the separation of powers in our constitution."); *Coldsprings Twp v Kalkaska Co Zoning Bd of Appeals*, 279 Mich App 25, 28; 755 NW2d 553 (2008) (citation and quotation marks omitted; emphasis added) ("[T]he elements of individual and organizational standing must be met in environmental cases *as in every other lawsuit*, unless the constitution provides otherwise.").

"[W]hen standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue." *House Speaker v Governor*, 443 Mich 560, 572 n 15; 506 NW2d 190 (1993), citing *Flast v Cohen,* 392 US 83, 99-100; 88 S Ct 1942; 20 L Ed 2d 947 (1968). "The purpose of the standing doctrine is to assess whether a litigant's interest in the issue is sufficient to 'ensure sincere and vigorous advocacy.' " *Lansing Sch Ed Ass'n*, 487 Mich at 355 (citations omitted). Absent standing, a court's decision would constitute a mere advisory opinion, which is outside the "judicial power"

4

provided for by our Constitution. See generally *Nat'l Wildlife Federation*, 471 Mich at 612-614, citing Cooley, *A Treatise on the Constitutional Limitations* (Little, Brown & Co, 1886) at 92.[7]

Thus, under the Michigan Constitution, a litigant has standing whenever there is a legal cause of action. Further, a litigant who meets the requirements of MCR 2.605 sufficiently establishes standing to seek a declaratory judgment. *Lansing Sch Ed Ass'n*, 487 Mich at 372. If a cause of action is not provided at law,

> then a court should, in its discretion, determine whether a litigant has standing. A litigant may have standing in this context if the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the Legislature intended to confer standing on the litigant. [*Id.* at 373.]

Here, the is no cause of action provided by law. The EMA, however, provides that an executive order which the governor issues under its authority expires after 28 days "unless a request by the governor for an extension of the state of disaster for a specific number of days is approved by resolution of both houses of the legislature." MCL 30.403(3) (regarding states of disaster); MCL 30.403(4) (regarding states of emergency). The Legislature argues that under the required *in pari materia* reading of the EMA and the EPGA, the provisions of the EMA control; the Legislature thus argues that failing to grant it standing in this case would have the effect of nullifying the statutory scheme which the Legislature enacted regarding time limits for the executive orders at issue, a position which the Court of Claims accepted. In addition, the Legislature argues that the EPGA is unconstitutional.

"For purposes of determining standing, we must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *American Family Ass'n of Mich v Mich State Univ Bd of Trustees*, 276 Mich App 42, 45-46; 739 NW2d 908 (2007) (citations and quotation marks omitted). As such, I must consider as true the Legislature's

---

[7] In a number of cases, including *House Speaker v State Admin Bd*, 441 Mich 547, 560 and n 20; 495 NW2d 539 (1993) and *Rohde v Ann Arbor Pub Sch*, 479 Mich 336; 737 NW2d 158 (2007), our Supreme Court emphasized that "[o]ne notable distinction between federal and state standing analysis is the power of this Court to issue advisory opinions. Const 1963, art 3, § 8. Under Article III of the federal constitution, federal courts may issue opinions only where there is an actual case or controversy." See *House Speaker,* 441 Mich at 559 and n 20. Const 1963, art 3, § 8, is limited in scope in a number of respects, providing that "Either house of the legislature or the governor may request the opinion of the supreme court on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date." Thus, while that provision authorizes the Supreme Court under certain circumstances to issue an advisory opinion, there is no such provision granting this Court such authority. Thus, this Court is bound to find standing in a case before we may exercise the judicial power.

5

allegations that, in issuing her executive orders and repeatedly extending a state of emergency without legislative approval, the Governor encroached on its authority. See *id*.

It is of course clearly-settled law that "Interpretation of the State Constitution is the exclusive function of the judicial branch. Construction of the Constitution is the province of the courts and this Court's construction of a State constitutional provision is binding on *all* departments of government." *House Speaker*, 443 Mich at 575 n 19, citing *Richardson v Secretary of State,* 381 Mich 304, 309; 160 NW2d 883 (1968). See also *House Speaker*, 443 Mich at 575 n 19, citing *Regents of the Univ of Mich v Employment Relations Comm,* 389 Mich 96, 103; 204 NW2d 218 (1973) ("A conflict between the constitution and the statute is clearly a legal question which only a court can decide").

I would find, as did the Court of Claims, that given the statutory structure of the EMA, and the significant issues regarding the EMA's interrelationship with the EPGA, as well as the question of the constitutionality of the EPGA under the circumstances presented, see Part IV of this opinion, that the Legislature has alleged a special injury or right, as well as a substantial interest, that will be detrimentally affected in a manner different from the citizenry at large. *Lansing Sch Ed Ass'n*, 487 Mich at 372. The Legislature alleges that its statutory authority to decline a Governor's request to extend a state of disaster or state of emergency is being effectively eviscerated through the Governor's actions; given the language of the EMA, I agree that the allegation of a loss of such prerogatives through encroachment by a different branch of government constitutes "a special injury or right." By definition, such an injury is one which only the Legislature could suffer, as the Legislature is the only entity which is given authority to authorize or to decline to authorize requests to extend a state of emergency. It seems clear to me that the Legislature thus alleges a "special injury," as such an injury, if it occurred, could affect the scope of the Legislature's powers only; and it also is clear that, because it is an injury which could affect the Legislature powers only, the injury is not one which would affect the citizenry at large, other than in the general sense of the law not being followed, which is insufficient to establish standing.

Moreover, a party has standing "if the statutory scheme implies that the Legislature intended to confer standing on the litigant." *Lansing Sch Ed Ass'n*, 487 Mich at 372. Given the nature of the disputes in this case, involving statutory and constitutional interpretation, only the judicial branch could resolve them. And I see no reason to conclude that the Legislature would have gone to the trouble of enacting the time limitation provisions of the EMA, which, when applicable, work to grant it the ability to cabin the governor's authority, if it did not intend to afford itself recourse to the courts in those instances in which it alleged that the governor failed to comply with such limits.

In other words, in my opinion the Legislature has alleged a special injury unique to it; an injury not available to the public at large, or any other person or entity, thus establishing that the Legislature's injury is different in kind from any potentially suffered by the public at large; that the nature of the disputes are such that only the judicial branch can conclusively determine them; and that the statutory scheme evinces an intention on the part of the Legislature to grant itself

6

standing to litigate such suits.[8] The fact that the injury would have "completely nullified" the Legislature's authority under the statutory scheme, see *Arizona State Legislature v Arizona Independent Redistricting Comm*, ___ US ___; 135 S Ct 2652; 192 L Ed 704 (2015); *Tennessee General Assembly v United States Dep't of State*, 931 F3d 499 (CA 6, 2019), and thus also would have satisfied the more restrictive Article III definition of standing, as the Court of Claims also concluded, in my opinion simply reinforces that the Legislature has established standing. I therefore turn to the merits of the case.

## II. STANDARD OF REVIEW

The questions presented here all are subject to de novo review. We review de novo whether a party has standing to pursue a case, *In re Gerald L Pollack Trust*, 309 Mich App 125, 153; 867 NW2d 884 (2015); the proper interpretation and construction of statutes, *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 205; 815 NW2d 412 (2012); and the scope of constitutional provisions, *Thomas v Pogats*, 249 Mich App 718, 724; 644 NW2d 59 (2002).

## III. STATUTORY CONSTRUCTION

As an initial matter, the majority states that the Legislature failed to argue, in its brief on appeal, that the EPGA does not apply to epidemics. At oral argument, however, the Legislature made clear that it *was* making such an argument. I question, therefore, whether the Legislature could be deemed to have waived anything. More fundamentally, this case properly involves interpretation of two statutes *in pari materia*. Under the *in pari materia* rules of construction, we are to find a harmonious reading of the two statutes if possible. In undertaking that task, we are not restricted by whether a party made a particular argument for a harmonious reading of the statutes; the proper interpretation of statutes is a judicial function, which cannot be waived by a party. I discern no basis for the Legislature's argument that, properly construed, the EPGA has a geographic limitation, and therefore I agree with the majority as to that point; but nonetheless I would find that the proper construction demonstrates the inapplicability of the EPGA to an "epidemic."

### A. *IN PARI MATERIA* CANON OF CONSTRUCTION

Both the EPGA and the EMA deal with the declaration of a state of emergency in the generic sense;[9] the invocation of emergency powers to address such emergencies, which powers vary markedly from those ordinarily in effect under our constitutional structure; and the limits, if

---

[8] While I acknowledge that the Legislature has the power through the normal political process to amend or repeal the EMA and the EPGA, which may have application to future executive actions, it does not have the power to ensure that the Governor has not exceeded a governor's power under these statutes as currently in force, the issue presented here. That is the judiciary's role.

[9] Under the EMA, a governor can declare a "state of disaster," MCL 30.403(3), or a "state of emergency," MCL 30.403(4). However, an epidemic can only be the basis for executive action as a state of disaster, as is expressly provided by the EMA's definitions. See MCL 30.402(e); note 16 of this opinion (discussing the *expressio unius* canon of construction).

7

any, placed on a governor exercising such powers. As such, both statutes relate to the same subject matter, and thus are *in pari materia* (literally, "in a like manner"). "It is the rule that in construction of a particular statute, or in the interpretation of its provisions, all statutes relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law, although enacted at different times, and containing no reference one to the other." *Detroit v Mich Bell Tel Co*, 374 Mich 543, 558; 132 NW2d 660 (1965), overruled on other grounds by *City of Taylor v Detroit Edison Co*, 475 Mich 109, 119; 715 NW2d 28 (2006). " 'The object of the rule *in pari materia* is to carry into effect the purpose of the legislature as found in harmonious statutes on a subject.' " *Jennings v Southwood*, 446 Mich 125, 137; 521 NW2d 230 (1994), quoting *Wayne Co v Auditor General*, 250 Mich 227, 233; 229 NW 911 (1930). That is because "[s]everal acts *in pari materia*, and relating to the same subject, are to be taken together, and compared in the construction of them, because they are considered as having one object in view, and as action upon one system." 1 James Kent, Commentaries on American Law 433 (1826), cited in Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (Thompson/West, 2012), p 252. When applying an *in pari materia* construction, "[i]f statutes lend themselves to a construction that avoids conflict, that construction should control." *Walters v Leech*, 279 Mich App 707, 710; 761 NW2d 143 (2008) (citation omitted). "When there is a conflict between statutes that are read *in para* [sic] *materia*, the more recent and more specific statute controls over the older and more general statute." *People v Buehler*, 477 Mich 18, 26; 727 NW2d 127 (2007), abrogated in part on other grounds by *People v Arnold*, 502 Mich 438; 918 NW2d 164 (2018). In addition, and outside the *in pari materia* rules of construction, we construe statutes in such a manner that each word has meaning, and that no word is deemed to be surplusage or nugatory. *Apsey v Mem Hosp*, 477 Mich 120, 127; 730 NW2d 695 (2007).[10]

## B. BACKGROUND INFORMATION REGARDING THE STATUTORY SCHEMES

Under the EMA:

1. An "epidemic" expressly may be a triggering event for executive action.[11] MCL 30.402(e); MCL 30.403(3).

2. A declaration of a state of disaster authorizes a governor, in addition to some specific powers, to "Direct all other actions which are necessary and appropriate under the circumstances." MCL 30.405(1)(j).

3. Such a state of disaster must terminate after 28 days unless the governor requests and the Legislature approves an extension. MCL 30.403(3).

---

[10] Just so it is absolutely clear, there are three general canons of construction implicated here: (1) statutes regarding the same general subject matter are construed *in pari materia*; (2) we assume that the Legislature did not intend for its enactments to be mere surplusage, but rather that is strives for an interpretation which gives every word meaning; and (3) we assume that when the Legislature enacts legislation, it knows what the existing state of the law is and crafts its work accordingly.

[11] See Note 9 of this opinion.

Under the EPGA:

1.  The governor may declare a state of emergency "[d]uring times of great public crisis, disaster, rioting, catastrophe, or similar public emergency within the state." MCL10.31(1).

2.  "After making the proclamation or declaration, the governor may promulgate reasonable orders, rules, and regulations as he or she considers necessary to protect life and property or to bring the emergency situation within the affected area under control," and provides a non-exclusive list of the governor's powers. MCL 10.31(1).

3.  Such orders are in effect until they expire under their own terms, or when the governor declares "that the emergency no longer exists." MCL 10.31(2). The majority concludes that the governor may invoke the EPGA based on an epidemic or a pandemic.[12] There are no categorical limits placed on the orders which a governor can impose after a declaration under either statute: the EPGA permits "reasonable orders, rules, and regulations as he or she considers necessary to protect life and property or to bring the emergency situation within the affected area under control," while the EMA permits the governor to "[d]irect all other actions which are necessary and appropriate under the circumstances." There is no material difference between the two; each permits the governor to take whatever actions the governor deems necessary.

Thus, applying the rules of construction in a straightforward manner, it is readily apparent that the inclusion of the word "epidemic" in the definition of disaster under the EMA means that the Legislature did not understand any of the EPGA's triggering events to include an epidemic; if the EPGA applied to an epidemic, there would have been no reason to include it in the EMA definition, as it would be a redundancy, contrary to how we construe statutes, because the governor can impose all of the same relief under the EPGA as may be imposed under the EMA. Reading the EPGA in the manner it does, the majority renders at least a portion of it a redundancy; there is

---

[12] Under that section, "Disaster" means an occurrence or threat of widespread or severe damage, injury, or loss of life or property resulting from a natural or human-made cause, including, but not limited to, fire, flood, snowstorm, ice storm, tornado, windstorm, wave action, oil spill, water contamination, utility failure, hazardous peacetime radiological incident, major transportation accident, hazardous materials incident, *epidemic*, air contamination, blight, drought, infestation, explosion, or hostile military action or paramilitary action, or similar occurrences resulting from terrorist activities, riots, or civil disorders." (Emphasis added.) The Covid threat has been deemed a "pandemic." A "pandemic" is an outbreak of a disease that occurs over a wide geographic area and affects an exceptionally high proportion of the population. An "epidemic," by contrast, means "an outbreak of disease that spreads quickly and affects many individuals at the same time." A pandemic is thus more widespread and thus a greater disaster than an epidemic. The greater necessarily includes the lesser; as the EMA expressly defines an epidemic to be a disaster, a fortiori a pandemic also qualifies as a disaster.

nothing the governor can do under one statute that could not also be done under the other. Given that fact, there was no reason for the Legislature to have enacted the EMA.

Of course, we do not construe any word in a statute to be nugatory if there is an alternative interpretation. A straightforward reading of the statutes, in light of the canons of construction, in facts yields such an alternative interpretation: the Legislature would not have included the word "epidemic" as a permissible triggering event under the EMA, and would not have otherwise mimicked the EPGA, unless it understood the EPGA to not apply to an epidemic. This is the only interpretation which makes sense of the inclusion of the word "epidemic" in the EMA—a word which is notably absent from the EPGA—and which also explains the Legislature's creation of executive authority which otherwise would be substantively identical to that provided in the EPGA.

### C. THE GOVERNOR'S "BELT AND SUSPENDERS" ARGUMENT

The Governor makes two arguments in response to this point. First, the Governor argues that by including the word "epidemic" as a condition which can justify a state of disaster under the EMA, the Legislature employed "a belt and suspender" approach to show the importance it attached to the use of the word in the EMA; the Governor makes this assertion even though, in the Governor's view, the EPGA already reached epidemics at the time the Legislature defined an "epidemic" as a disaster under the EMA. This response by the Governor is particularly weak, as it stands on its head a long-standing canon of construction which assumes that the Legislature did not intend to enact surplusage; rather, the Governor would have us hold that if the Legislature deems a situation unusually important, it *would* enact surplusage as a means of signaling to the world the importance it attaches to a particular construction. Frankly, this argument is frivolous, because there are accepted methods by which a Legislature knows how to communicate its intent, and by which courts know how to discern the Legislature's intentions; enacting surplusage is simply the opposite of the manner in which the Legislature does so. See, e.g., *United States v Butler*, 297 US 1, 65 (1936) ("These words cannot be meaningless, else they would not have been used."), cited in *Reading Law*, p 174. Our own Justice Cooley made the same point well over 150 years ago, when he wrote "The courts must lean in favor of a construction which will render a word operative, rather than one which may make some idle and nugatory." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 58 (1968), cited in *Reading Law*, p 174 n 3 (brackets and ellipsis omitted). That approach has been uniformly followed until the present. See, e.g., *Apsey*, 477 Mich at 127 ("Whenever possible, every word of a statute should be given meaning. And no word should be treated as surplusage or made nugatory.").

The EPGA authorizes the Governor, in a state of emergency, which includes a "disaster,"[13] to "promulgate reasonable orders, rules, and regulations as he or she considers necessary to protect

---

[13] The EPGA applies to a "great public crisis, disaster, rioting, catastrophe or similar public emergency." There can be no doubt that a "public emergency" under that definition comports with the definition of "state of emergency" under the EMA, and that the EPGA's use of the term

life and property or to bring the emergency situation within the affected area under control," and provides a non-exclusive list of the governor's powers. MCL 10.31(1).   Thus, the majority holds that from 1945 on, following the enactment of the EPGA, and continuing on through 1976 and the enactment of the EMA until today, the governor had essentially unlimited authority to deal, on an emergency basis, with epidemics and threats to public health.  Such a construction is an absurdity in light of the Legislature's specific use of the word "epidemic" in the definition of "disaster," in the EMA.  As I already have noted, we assume that when the Legislature crafts legislation it knows what the existing law is, and takes it into consideration.  *O'Connell v Dir of Elections*, 316 Mich App 91, 99; 891 NW2d 240 (2016).  If the Governor's position is correct, the Legislature, knowing that the Governor's authority to take executive action under the EPGA included the authority to address an "epidemic," nonetheless granted the Governor the authority, in the EMA, to address an "epidemic."  Such a conclusion flies in the face of how courts and legislatures go about their business of crafting their work and taking steps, through well-understood conventions, of ensuring that they each understand exactly what is intended of the other.  Here, that means that the 1976 Legislature can only be deemed to have understood that the EPGA *did not* extend to epidemics; thus, the only legislative enactment which covers such an event is the EMA.[14]

---

"disaster," which itself can constitute a "public emergency," comports with the EMA's use of that same term.

[14] It is not entirely correct to say that neither the EPGA nor the EMA have any limits as to the nature of the orders which the governor may issue following a declaration of an emergency.  Both the EPGA and the EMA, in nearly identical terms, provide that an executive order issued under either of them "does not authorize the seizure, taking, or confiscation of lawfully possessed firearms, ammunition, or other weapons," EPGA, MCL 10.31(3); nor does it "authorize the seizure, taking, or confiscation of lawfully possessed firearms or ammunition," EMA, MCL 30.405(2).

There are two possible interpretations of the inclusion of the firearms protection language in the two statutes.  One is that the Legislature, in enacting the EMA, recognized that it was extending executive authority to new areas, in instances in which such authority had not previously existed; an "epidemic," as discussed in Part III of this opinion, is one example of such a recognition by the Legislature.  Given that knowledge, had the Legislature wanted to continue the policy-driven decision of protecting lawfully possessed firearms, it would have had to include such language in the EMA, because it would have understood that the EPGA did not apply to such circumstances.  Such an interpretation supports the statutory conclusion I reach in this opinion.

The other alternative is that the Legislature simply wanted, again for policy reasons, to reduce the scope of the firearms-protection provision of the EMA, MCL 30.405(2), by removing "other weapons," thereby limiting protections to lawfully-possessed firearms and ammunition.  All firearms are weapons, but not all weapons are firearms.  See *Merriam-Webster's Collegiate Dictionary* (11th ed) (defining "firearm" as "a weapon from which a shot is discharged by gunpowder—usu. used of small arms" and defining "weapon" as "something (a club, knife, or gun) used to injure, defeat, or destroy" and as "a means of contending against another"); *New World Dictionary* (2nd ed) (defining "firearm" as "any weapon from which a shot is fired by the

## D.  THE GOVERNOR'S AND THE MAJORITY'S RELIANCE ON MCL 30.417(D)

The majority, and the Governor, rely on Section 17(d) of the EMA, in an attempt to show that the Legislature's use of the word "epidemic" in the EMA works no redundancy with the EPGA.  Under Section 17(d), MCL 30.417(d), the EMA "shall not be construed to do any of the following":

> (d) Limit, modify, or abridge the authority of the governor to proclaim a state of emergency pursuant to Act No. 302 of the Public Acts of 1945, being sections 10.31 to 10.33 of the Michigan Compiled Laws, or exercise any other powers vested in him or her under the state constitution of 1963, statutes, or common law of this state independent of, or in conjunction with, this act.

This is the critical statutory provision in this case; it is the only textual basis which could arguably show a reasonable reading of Legislative intent in derogation of the normal canons of construction.  See *People v Pinkney*, 501 Mich 259, 283; 912 NW2d 535 (2018) (holding that canons of construction can be overcome if there is sufficient evidence to do so).

### 1.  SCOPE OF THE GOVERNOR'S AUTHORITY TO DECLARE A STATE OF EMERGENCY UNDER THE EPGA

Section 17(d) is divided into two disjunctive parts.  As noted, the first portion provides that the EMA shall not be construed to "limit, modify, or abridge the authority of the governor to *proclaim* a state of emergency pursuant to" the EPGA (emphasis added).  The authority to proclaim an emergency, under either the EPGA or the EMA, is a distinct authority.  Whether the governor also has the additional power to have any such declared emergency continue, without any limitations or input from anyone else, so long as the governor sees fit to do so, the position the Governor argues and the majority adopts, is the question presented here and through an *in pari materia* reading of the two statutes, and is a conclusion with which I do not agree.  Nothing that I have said regarding the governor's authority under the EPGA and its interplay with § 17(d) in any way limits the authority of the Governor to issue a declaration of emergency.  Simply put, the first part of § 17(d) has no application to this case.[15]

---

force of an explosion; esp., such a weapon small enough to be carried, as a rifle or pistol" and defining "weapon" as "an instrument or device of any kind used for fighting, as specif. in warfare," and as "any means of attack or defense").  (Those definitions have remained consistent over time, and thus are no different today than they were upon enactment of the two statutes.)  As an aid to statutory interpretation, this possibility does not clarify the interrelationship between the EPGA and the EMA at all, as there are two potentially harmonious readings of the statutes.  However, one can conclude from the two firearms provisions that they either support the statutory interpretation I make in this opinion, or they are neutral as to it; in no way do they detract from that interpretation.

[15] The majority simply misreads this portion of § 17(d), engrafting onto it language which it does not contain.  The majority states that it rejects "any contention that this provision only bars a

12

That brings us to the second portion of the statute. It provides, as relevant here, that the EMA shall not be construed to "Limit, modify, or abridge the authority of the governor . . . to exercise any other powers vested in . . . him or her under . . . statutes[.]"[16] Let us simply assume that the "statutes" referred to include the EPGA, because that assumption does not affect the final analysis. This is so because it is not *a construction of the EMA* as such which places the EPGA off-limits for an executive declaration regarding an epidemic. Rather, it is the straight-forward application of standard rules of construction, applicable in all instances to all statutes, under which we determine the scope of the EPGA as written by the Legislature. To recapitulate reasons already stated, *viz.*, that any other construction would render the Legislature's use of the word "epidemic" in the EMA surplusage, it is clear that the Legislature which enacted the EMA did not understand the EPGA to encompass epidemics, because, simply put, the Legislature would not have intended to enact surplusage; we assume that when the Legislature crafts legislation it knows what the existing law is, and takes it into consideration, *O'Connell*, 316 Mich App at 99, and there simply is no reason the Legislature would have included the word "epidemic" in the EMA if it understood the EPGA to already have covered such a situation, *Apsey*, 477 Mich at 127. Thus, it is not the EMA which in any way limits the application of the EPGA to epidemics, but rather the standard rules of construction, which embody assumptions about how legislatures work, which control that interpretation. The canons of construction work in both directions—courts use the canons so that there are consistent applications of the law in judicial opinions; but the canons also allow legislators and legislatures to know in advance how courts will construe the work of a legislative

---

limitation, modification, or abridgement of a governor's authority *to proclaim or declare* a state of emergency under the EPGA, absent any application to the *extension* of a state of emergency, thereby allowing imposition of the legislative-approval provision in § 3 of the EMA." By this reading, the majority asserts that the word "proclamation" is broader than the mere formal announcement of a state of emergency. That reading is not supported by the statutory text. MCL 30.405 provides that "In addition to the general authority granted to the governor by this act, the governor may, upon the declaration of a state of disaster or state of emergency do 1 or more of the following: . . ." Thus, the text is clear that the governor's authority to take certain actions has as a prerequisite the declaration of a state of disaster or emergency, but that those powers are distinct from, although they are triggered by, the declaration itself. The EMA also makes clear that an extension is a separate act requiring the Legislature's approval. See MCL 30.403 and MCL 30.404.

[16] It is not clear that the statutes referred to include the EPGA, as there already was one reference to that statute in section 17(d), and, as noted, that reference did not relate to the authority of the governor to do anything under the EPGA except to declare an emergency. Generally speaking, the doctrine of *expressio unius est exclusio alterius* ("express mention in a statute of one thing implies the exclusion of other similar things") would exclude the EPGA from the inclusion in the collective "statutes." *Hoste v Shanty Creek Mgt, Inc*, 459 Mich 561, 572, 592 NW2d 360 (1999). As applicable here, that would be because the single, specific reference in § 17(d) to the EPGA, followed by the general reference to "statutes" which follows would not include the EPGA as one of those statutes. But we need not decide that question here to determine the scope of the governor's authority.

13

branch. The doctrine that the Legislature is presumed to know the existing law when it writes a statute includes a presumption that the Legislature knows how a law will be interpreted in connection with the canons. See *McNary v Haitian Refugee Ctr., Inc.*, 498 US 479, 496; 111 S Ct 888; 112 L Ed 2d 1005 (1991) ("It is presumable that Congress legislates with knowledge of our basic rules of statutory construction[.]"), cited in *Reading Law*, p 269 n 6.

Simply put, the Legislature would have known, prior to enactment of the EMA, that by including the word "epidemic" in it, it was telling the courts that the Legislature did not consider epidemics to be covered by the existing law, the EPGA, and that it understood that courts would so interpret its actions. Contrary to the majority, this is not "reading a requirement for legislative approval to extend a state of emergency into the EPGA." It is simply a confirmation that given the language used and the standard canons of construction, the Legislature which enacted the EMA did not understand the EPGA to apply to an epidemic, and therefore has no application to the present circumstances. Indeed, there would be no point in reading something into a statute which never applied to the situation at hand. Nor does this analysis constitute a judicial construction which *limits, modifies, or abridges* the governor's power, as is prohibited by § 17(d), but is a mere literal application of the Legislature's words to demonstrate that the EPGA never extended so far as to encompass authority over an epidemic. This construction not only does not run afoul of § 17(d), it is compelled by it —a court cannot "limit," or "modify," or "abridge," an authority of the Governor which the Governor never possessed in the first instance.[17]

## 2. THE GOVERNOR'S CONSTRUCTION LEADS TO AN ADDITIONAL REDUNDANCY

In addition, the majority's and the Governor's construction of the two statutes render another portion of the EMA redundant or nugatory. As the Court of Claims correctly noted, the EMA permits the Governor to declare a state of disaster or a state of emergency. Each of those types of declarations has a durational limit.

> The state of disaster shall continue until the governor finds that the threat or danger has passed, the disaster has been dealt with to the extent that disaster conditions no longer exist, or until the declared state of disaster has been in effect for 28 days. After 28 days, the governor shall issue an executive order or proclamation declaring the state of disaster terminated, unless a request by the governor for an extension of the state of disaster for a specific number of days is approved by resolution of both houses of the legislature. [MCL 30.403(3)].

---

[17] And consistent with that reading, there was a public health code which long predated the EPGA, and which authorized emergency government action to address "cholera and other dangerous communicable diseases," see 1885 PA 230, § 2. The EPGA did not repeal or amend that statute, thus strengthening the inference that the 1945 Legislature did not intend to change the emergency powers to address epidemics from the historical approach. That historical approach to epidemics and emergency powers changed with the enactment of the EMA.

Similarly, for a state of emergency:

> The state of emergency shall continue until the governor finds that the threat or danger has passed, the emergency has been dealt with to the extent that emergency conditions no longer exist, or until the declared state of emergency has been in effect for 28 days. After 28 days, the governor shall issue an executive order or proclamation declaring the state of emergency terminated, unless a request by the governor for an extension of the state of emergency for a specific number of days is approved by resolution of both houses of the legislature.  [MCL 30.403(4)].

The majority and the Governor take the position that the EPGA and the EMA are coextensive, providing the Governor the same authority to issue orders, as to essentially any subject.  Again, the Legislature knew all of that at the time it enacted the EMA.  Yet the Legislature also enacted the 28-day time limit on the governor's unilateral authority under the EMA.  To engraft such a durational limitation on the EMA, while leaving the governor's equivalent powers under the EPGA completely unconstrained, subject only to the governor's whim, would render the EMA's time limits surplusage.[18]

Indeed, unless we construe the statute in the manner I suggest, one is left scratching one's head wondering what the Legislature thought it was accomplishing through the EMA.  According to the majority, what the Legislature thought it was accomplishing was the enactment of a clone of the EPGA, but with a provision terminating the governor's executive authority after 28 days unless that self-same Legislature gave its approval.  But according to the majority, the Legislature also allowed the EPGA to co-exist, so that the governor could circumvent the 28-day limit on executive action by the governor which the Legislature had just gone to the trouble of enacting.

Such an assertion simply makes no sense.  Obviously, the Legislature did not intend its pronouncements in the EMA to be surplusage or nugatory.  Thus, properly construed, there is

---

[18] The majority's construction of the word "epidemic" in the EPGA "is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction." *Rivers v Roadway Express, Inc,* 511 US 298, 312-313; 114 S Ct 1510; 128 L Ed 2d 274 (1994).  See also *id.,* at 313, n 12; *Plaut v Spendthrift Farm, Inc*, 514 US 211, 216; 115 S Ct 1447; 131 L Ed 2d 328 (1995).  In other words, when a court "construes a statute, it is explaining its understanding of what the statute has meant continuously since the date when it became law." *Rivers*, 511 US at 313 n 12.  We presume that when the Legislature acts, it knows what the law is. *Apsey*, 477 Mich at 127.  Thus, under the majority's view, the Legislature knew in 1976 that it already possessed the same authority under the EPGA to address epidemic and public health emergencies as it was to enact under the EMA.  And yet, the Legislature nonetheless enacted a limitation on the Governor's authority to act unilaterally under the EMA, but refused to enact a similar limit under the EPGA; and allowed the Governor to proceed under either authority.  Thus, the Legislature enacted a durational limit of 28-days on executive action, but gave the Governor full authority to opt-out from under such time limits any time the Governor so chose.  Again, it is logically absurd for a court to conclude that the Legislature so intended.

nothing in the EMA which limits the Governor's authority under the EPGA; the EPGA simply does not apply to the current situation, involving a pandemic, and the only authority upon which the Governor may rely for her executive orders regarding it is the EMA, with its associated time limit.

The majority's construction, meanwhile, is no construction at all. Although we are supposed to employ a harmonious reading of the two statutes if possible, the majority arrives at a construction under which the EPGA and the EMA each apply to an epidemic; the governor can proceed under either one, without any restriction; each permits the governor to exercise unlimited power; but one limits the governor's authority to 28 days without legislative authorization while the other continues indefinitely until the governor says otherwise. This result by the majority constitutes anything but a harmonious construction; it is a completely discordant result which does not even attempt to reconcile the inconsistencies between the two statutes, but simply lumps all of the various aspects of them together, throws up its hands, and concludes, essentially, "Who are we to say that the Legislature did not intend to nullify its own work?" If the majority was unable to harmonize the result, as it obviously was, then it was obligated to give controlling effect to the more recent and more specific statute, the EMA. See *Buehler*, 477 Mich at 26.[19]

## IV. UNDER THE CIRCUMSTANCES OF THIS CASE, THE EPGA IS UNCONSTITUTIONAL

### A. THE FRAMEWORK

The majority holds that the EPGA is constitutional on the basis of *Blue Cross & Blue Shield of Mich v Milliken*, 422 Mich 1, 51-52; 367 NW2d 1 (1985). This Court reviews constitutional issues de novo. *Janer v Barnes*, 288 Mich App 735, 737; 795 NW2d 183 (2010). Although the question presented in *Blue Cross* regarding the lawfulness of the delegation of legislative power

---

[19] It is worth underscoring that the majority's construction of the word "epidemic" in the EPGA "is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction." *Rivers v Roadway Express, Inc,* 511 US 298, 312-313, 114 S Ct 1510, 128 L Ed 2d 274 (1994). See also *id.* at 313, n 12; *Plaut v Spendthrift Farm, Inc*, 514 US 211, 216, 115 S Ct 1447, 131 L Ed 2d 328 (1995). In other words, when a court "construes a statute, it is explaining its understanding of what the statute has meant continuously since the date when it became law." *Rivers*, 511 US at 313 n 12. We presume that when the Legislature acts, it knows what the law is. *Apsey*, 477 Mich at 127. Thus, under the majority's view, the Legislature knew in 1976 that it already possessed the same authority under the EPGA to address epidemic and public health emergencies as it was to enact under the EMA. And yet, the Legislature nonetheless enacted a limitation on the Governor's authority to act unilaterally under the EMA, but refused to enact a similar limit under the EPGA; and allowed the Governor to proceed under either authority. Thus, the Legislature enacted a durational limit of 28-days on executive action, but gave the Governor full authority to opt-out from under such time limits any time the Governor so chose. Again, it is logically absurd for a court to conclude that the Legislature so intended.

16

was significantly narrower than the question presented here, in *Blue Cross* our Supreme Court established the framework for evaluating all such claims.

*Blue Cross* considered whether the Nonprofit Health Care Corporation Reform Act, MCL § 550.1101 *et seq.*, represented an unconstitutional delegation of legislative authority to Blue Cross Blue Shield of Michigan and other private parties. Specifically, that Act required each non-profit health care corporation to "assign a risk factor for each line of the corporation's business." *Blue Cross*, 422 Mich at 52-53. The Insurance Commissioner then was required either to approve or disapprove the factors proposed by the health care corporation, but "[n]o guidelines are provided to direct the Insurance Commissioner's response." *Id*. And finally, if the risk factors were disapproved, a panel of three actuaries " 'shall determine a risk factor for each line of business.' No further directions are set forth to guide the panel." *Id*. at 52-53. The Court held that "[t]he act is completely devoid of any indication why one factor should be preferred over another; no underlying policy has been articulated, nor has the Legislature detailed the criteria to be employed by the panel in making this determination." *Id*. at 55, citing *Osius v City of St. Clair Shores*, 344 Mich 693; 75 NW2d 25 (1956). "This complete lack of standards is constitutionally impermissible," such that "the lack of standards defining and directing the Insurance Commissioner's and the actuary panel's authority renders this dispute resolution mechanism constitutionally defective." *Id*.

*Blue Cross* is instructive as to the present case, and establishes the framework for evaluating claims of improper delegation of legislative power. The Court held that in reviewing such claims, "1) the act must be read as a whole; 2) the act carries a presumption of constitutionality; and 3) the standards must be as reasonably precise as the subject matter requires or permits." *Blue Cross*, 422 Mich at 51. "The preciseness required of the standards will depend on the complexity of the subject." *Id*. Although the focus of the act at issue was narrow, the Court had no difficulty determining that it involved an impermissible delegation of legislative authority, because it gave no direction and created no standards as to how the authority should be exercised.

Moreover, our Supreme Court has noted on many occasions that

> The separation of powers doctrine has never been interpreted to mean that the three branches of government

>> must be kept wholly and entirely separate and distinct, and have no common link or dependence, the one upon the other, in the slightest degree. The true meaning is that the *whole power of one of these departments* should not be exercised by the same hands which possess the whole power of either of the other departments; and that such exercise of the whole would subvert the principles of a free Constitution." [*House Speaker v Governor*, 443 Mich 560, 586 n 32; 506 NW2d 190 (1993), citing *Local 321, State, Co & Muni Workers of America v Dearborn,* 311 Mich 674, 677; 19 NW2d 140 (1945), in turn quoting Story, *Constitutional Law* (4th ed), pp 380 (emphasis added).]

17

See also *Makowski v Governor*, 495 Mich 465, 482; 852 NW2d 61 (2014) (also quoting *Local 321, State, Co & Muni Workers of America*).

## B. THE EPGA DELEGATES LEGISLATIVE POWER

The issue here does not involve the declaration of an emergency; rather, the act of declaring such an emergency is properly to be regarded as executive action. See Const 1963, art 5, § 1. Instead, the issue is the orders authorized by such a declaration, which the majority holds have no categorical limitations, but rather essentially empower the governor to do anything.

More than one hundred years ago, our Supreme Court summed up quite nicely the principle involved: "The Legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action to depend." *King v Concordia Fire-Ins Co*, 140 Mich 258; 103 NW 616 (1905), cited in *In re Brewster Street Housing Site in City of Detroit*, 291 Mich 313, 340; 289 NW 493 (1939). Thus,

> The people, by the adoption of the Constitution, have vested the legislative power in the legislature of the State, subject to the initiative referendum and recall, and the legislature of the State cannot abdicate the power delegated to it by the Constitution, but it is clear the legislature may confer the authority for the finding of facts upon administrative officers, boards or commissions. [*In re Brewster Street Housing Site in City of Detroit*, 291 Mich at 340, citing *Horn v People*, 26 Mich 221 (1872).]

Clearly, the orders recently issued by the Governor involve no action by any administrative officer, board or commission; but rather the wholesale handing over to the governor of the unfettered discretion to legislate any emergency order which the Governor thinks appropriate. The delegation of authority under the EPGA, as interpreted by the majority, thus is legislative: "The Legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action to depend." *King v Concordia Fire Ins Co*, 140 Mich 258, 268; 103 NW 616 (1905), citing *Locke's Appeal*, 72 Pa 498 (1873). The orders here, however, involve the making of law. Thus, "[t]he true distinction, is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferred authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made." *King*, 140 Mich at 268-269 (citation and quotation marks omitted).[20]

---

[20] Indeed, our Supreme Court previously has held that a legislative act authorizing a quarantine to be carried out by health inspectors, under general rules enacted by the legislature which provided for discretion on the part of the inspectors as to when to detain persons and goods, subject to standards set forth in the legislation, was constitutional. *Hurst v Warner*, 102 Mich 238, 244; 60 NW 440, 441 (1894). The EPGA is quite different, in that it allows the governor to create any rule the governor wishes, as to any subject, in the first instance. That power is legislative.

## C. AS INTERPRETED BY THE MAJORITY, THE GOVERNOR EXERCISES FULL LEGISLATIVE POWER AS WELL AS FULL EXECUTIVE POWER

Having determined that the orders issue by the Governor are in fact legislative, it is apparent that, under the circumstances of this case, the executive orders which were issued are in fact unconstitutional. As the majority interprets the governor's authority to issue the orders, they involve the whole power of the Legislature, as there are no subject matters which are outside their potential scope. Because, as the majority finds, there are no limits as to the subject matter which a governor may order or regulate or direct in this manner pursuant to the EPGA, the governor thus is granted "the *whole power of one of these departments*" of government, i.e., the full legislative power. *House Speaker*, 443 Mich at 586 n 32 (emphasis added). And the Governor of course retains the full executive power of that office as well. Const 1963, art 5, § 1.

Acting under the EPGA, the governor thus possesses the full power of the legislative branch, as well as the full power of the executive branch; in other words, the EPGA, as interpreted by the majority, commits to the governor "the whole power of one of these departments," allowing it to be "exercised by the same hands which possess the whole power of either of the other departments." *House Speaker*, 443 Mich at 586 n 32. That is, precisely the evil which the separation of powers doctrine was intended to preclude, and thus is unconstitutional. Const 1963, art 3, § 2. See *Makowski v Governor*, 495 Mich. at 482-483; *House Speaker*, 443 Mich at 586 n 32.

## D. THE MAJORITY OPINION FAILS TO CONSTRUE THE EPGA IN A MANNER WHICH WOULD PRECLUDE ITS UNCONSTITUTIONALITY HERE

The unconstitutionality of such a procedure would be mitigated if there were any durational limits imposed as to an executive order issued under the EPGA or the EMA. A durational limit (and not merely a gubernatorial rescinding of an order, followed by its reissuance in the identical or near identical form) would change the nature of any such order from something legislative, which simply lives on until it is repealed, to a true emergency order, which would exist only during a genuine period of emergency.[21]

The violation of the constitution, in my opinion, thus occurs through the confluence of two different authorities approved by the majority: the retention of the Governor's executive powers; plus the unlimited nature of legislative power granted the governor following a declaration of an emergency, including the unlimited duration of any such order.

The lack of any durational limit simply underscores and compounds the constitutional difficulty, transforming temporary, and thus emergency orders, into something essentially unlimited and thus legislative. It is settled that when applying strict scrutiny analysis, applicable to many of the most important constitutional rights, a court can uphold an action only if it involves

---

[21] As noted by the majority, "Pursuant to MCL 10.31(2), a governor proclaims or declares a state of emergency, and it simply continues until the governor declares 'that the emergency no longer exists.'" Taken together, these statements by the majority mean that a governor can order anything, forever, a truly striking concept in a democratic republic.

a "compelling governmental interest," which must be "narrowly tailored" to achieve that interest. See, e.g., *Burson v Freeman*, 504 US 191, 198; 112 S Ct 1846; 119 L Ed 2d 5 (1992) (impingement of First Amendment right). The "narrow tailoring" requirement imposes an obligation that whatever permissible action impinges a constitutional right continue no longer than necessary. See, e.g., *City of Richmond v JA Croson Co*, 488 US 469, 497-498; 109 S Ct 706; 102 L Ed 2d 854 (1989) (prohibiting remedy for discrimination "essentially limitless in scope and duration."); *In re National Security Letter*, 863 F3d 1110, 1126 (CA 9 2017) ("In order to ensure that the nondisclosure requirement is narrowly tailored to serve the government's compelling interest in national security, a nondisclosure requirement must terminate when it no longer serves such a purpose.").

The majority holds that the spare statutory standards of the EPGA, requiring only that the declaration involve a "great public crisis, disaster, rioting, catastrophe, or similar public emergency . . . or [when there is] reasonable apprehension of immediate danger of a public emergency of that kind," which also must imperil "public safety," is "as reasonably precise as the subject matter requires or permits." The majority adds "Indeed, more exacting standards would likely be overly confining and unnecessarily bind a governor's hands in any effort to mitigate and control an emergency at the very time he or she must need to be nimble." Moreover, the majority acknowledges that not only is the "standard" completely amorphous, but contains a large measure of subjectivity to whatever a governor desires. Thus, the majority holds that an order entered pursuant to a declared emergency need only be " 'reasonable' and, *as judged by a governor*, 'necessary to protect life and property or to bring the emergency situation . . . under control.' " *Id.* (emphasis added). This means that there are few objective, outside controls or standards at all, save for "reasonableness"; the statute essentially requires only a governor's subjective determination of what is necessary to control the situation.

Taking steps to deal with a global pandemic is certainly a "compelling government interest." Thus, there is no doubt that a government could take steps to address such a crisis for at least some period of time on an emergency basis, through means that ordinarily would not comport with constitutional restrictions; after all, the "constitutional Bill of Rights" is not "a suicide pact," *Terminiello v City of Chicago*, 337 US 1, 37; 69 S Ct 894; 93 L Ed 1131 (1949) (JACKSON, J., dissenting), nor is the constitutional separation of powers. This case does not address whether government has the authority to impose mandatory public health orders to address a crisis; clearly it does. See *Jacobson v Massachusetts*, 197 US 11; 25 S Ct 358; 49 L Ed 643 (1905). The issue here is not what actions may be taken, but how they are to be taken: by a governor, acting under emergency authority, with no limitations as to how, or how long, such measures may be instituted; or whether, following a reasonable period of emergency authority, legislative power must revert to normal constitutional norms. Our Constitution declares after all, that "All political power is inherent in the people." 1963 Const art 1, § 1.

No doubt to address this potentially gaping exception to normal, constitutional governance, the Legislature, in the EMA, enacted a rule that executive orders to address a state of emergency or a state of disaster, after a reasonable period not to exceed 28-days, must either terminate or be ratified by the elected Legislature. The Legislature has not authorized continued emergency action relating to an epidemic. In addition, the statutory construction of the EPGA and the EMA set forth in Part III of this opinion avoids the constitutional infirmity identified here, because an executive order which either becomes legislatively-authorized after 28 days, or terminates, is constitutionally

20

reasonable.  Indeed, that fact alone should give the majority pause about its statutory analysis that the EPGA applies without limitation to an epidemic, without any consideration of an *in pari materia* construction or the EMA's use of the word "epidemic."  "If statutes lend themselves to a construction that avoids conflict, then that construction should control." *People v Webb*, 458 Mich 265, 274; 580 NW2d 884 (1998).  See also *Hunter v Hunter*, 484 Mich 247, 264 n 32; 771 NW2d 694 (2009) (citation and quotation marks omitted) ("[A]s between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act.").

If the majority correctly read the EPGA and the EMA, in accordance with Part III of this opinion, such that only the EMA applied to an epidemic, then the executive orders here would be constitutional exercises of emergency powers, as they would be properly limited in duration, or constitutionally ratified by the Legislature.  However, given the majority's construction, that the EPGA not only applies, but that it authorizes unilateral action by the governor which "simply continues until the governor declares 'that the emergency no longer exists,' " it is unconstitutional in these circumstances.

I respectfully dissent from the majority's standing, statutory interpretation, and constitutional interpretation analysis.

/s/ Jonathan Tukel